IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SHEILA ZINNERMAN, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION 1:17-00123-KD-B |
| | ) | |
| WORTHINGTON INDUSTRIES, INC., | ) | |
|     Defendant. | ) | |

**ORDER**

This matter is before the Court on Defendant Worthington Industries, Inc. (Worthington)'s motion for summary judgment (Docs. 52-54), Plaintiff Sheila Zinnerman (Zinnerman)'s Response (Docs. 62-64), Worthington's Reply (Doc. 66) and Zinnerman's Sur-Reply (Doc. 67).

**I.**     **Findings of Fact**[1]

**A.**     **Zinnerman**

This failure to hire case stems from Zinnerman's claims against Worthington for sex and race discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq., The Civil Rights Act of 1964* (Count One). (Doc. 24).[2] Specifically, Zinnerman is an African-American female who was employed with Taylor-Wharton Cryogenics, LLC (Taylor)[3] in Theodore, Alabama for over 21 years (May 1994-December 2015). (Doc. 53-1 (Dep. Zinnerman at 8, 18, 27); Doc. 54 at 2; Doc.

---

[1] The facts are taken in the light most favorable to the non-movant. <u>Tipton v. Bergrohr GMBH–Siegen</u>, 965 F.2d 994, 998–999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

[2] In the Complaint, Zinnerman contends that she was not hired by Worthington due to her age. On summary judgment, Zinnerman asserts "Plaintiff is not pursuing her Count II ADEA claim." (Doc. 63 at 2). Zinnerman's ADEA claim is deemed abandoned such that it is **DISMISSED** and Defendant's motion is **MOOT** as to this claim.

Additionally, Zinnerman states that the operative complaint is Doc. 32. As detailed in Doc. 47, her motion to amend the complaint (Docs. 31, 32) was denied such that the operative complaint is Doc. 24.

[3] Taylor was in the cryoscience business --sold refrigerators, freezers and related equipment for medical uses in storing biological samples. (Doc. 53-1 (Dep. Zinnerman at 55-57)).

63-2 at 1 (Aff. Zinnerman)). Zinnerman worked in the following departments and/or positions: 1994-1997 accounting; 1997 customer service; 2000-2005 customer service supervisor/technical support supervisor; 2005-2009 senior customer service; 2010-2013 inside sales; and 2014 inside sales/customer service. (Doc. 24 at 3; Doc. 53-1 (Dep. Zinnerman at 29-32, 34-41); Doc. 63-2 at 2, 7 (Aff. Zinnerman)). Zinnerman's work history and experience includes: industrial and cryoscience sales (e.g., extensive cryoscience sales, commission sales, receipt of annual cryoscience sales agreement (through which she generated $2 million in sales every year from 2010-2015)), customer service and technical support. (Doc. 63-2 at 3, 5, 7 (Aff. Zinnerman); Docs. 63-3 to 63-7). As illustration, Zinnerman set up accounts for all of the customers, updated orders, sent out order acknowledgements, obtained freight quotes, issues Material Return Authorizations, answered customer service phones, issued credits, handled customer service duties, provided customer technical support, filled in for others, etc. (Doc. 63-2 at 3, 7 (Aff. Zinnerman)).

Zinnerman maintained an overall sales margin between 37-42 percent and received significant sales commissions from 2013-2015 in addition to her $52,000 base salary (e.g., total wages in 2013 $68,000, in 2014 $79,000 and in 2015 $80,000). (Id.) According to her 2013 performance review by Taylor, Zinnerman knew the cryoscience business inside and out. (Id. at 10; Doc. 63-10). Zinnerman was also the first/only person at Taylor to have the position/title of Inside Sales Rep., and her job required her to enter into a signed contractual sales agreement each year, from which she produced millions in sales annually. (Doc. 63-2 at 11-12 (Aff. Zinnerman)).

**B.    The Acquisition & Hiring Process**

On October 7, 2015, Taylor filed a voluntary Chapter 11 bankruptcy action in the United States Bankruptcy Court in Delaware. (Doc. 24). Worthington became interested in acquiring certain of Taylor's assets. After it became apparent the acquisition would occur, Taylor's Customer

Service Manager Matthew Seeds (Seeds) began talking with Worthington's Senior Customer Care Manager, Julia Yontz (Yontz), about how to integrate the sales and support functions of the companies. (Doc. 53-3 at 3-4 (Decltn. Seeds); Doc. 53-2 at 2-3 (Decltn. Yontz); Doc. 63-2 at 12 (Aff. Zinnerman)). In the Summer of 2015, Yontz visited the Alabama location and was introduced to all of the employees, such that she could have observed the race and sex of the employees at that time. (Doc. 63-2 at 12 (Aff. Zinnerman)). Worthington decided the "inside sales" and "customer support" jobs at Taylor would be handled in Ohio, and the Alabama operations would handle domestic/international customer service technical support -- i.e., Alabama would be the "technical support team." (Id.)

Worthington hired Seeds as the Technical Support Manager, leaving two (2) positions available. (Doc. 53-2 at 3-4 (Decltn. Yontz)). For "his team" in Alabama, Seeds sought individuals with: 1) a good rapport with customers; 2) good computer skills; 3) familiarity with return processes (warranty/non-warranty); 4) familiarity with the manufacturing process; 5) technical know-how; 6) flexibility; and 7) the ability to trouble shoot. (Doc. 53-3 at 4 (Decltn. Seeds)). A job announcement for "Inside Sales Representative" was posted on Worthington's website. (Doc. 63-2 at 7 (Aff. Zinnerman)). There was no posting for "technical support" positions. (Id.) Per Zinnerman, the Inside Sales Representative posting at that time is "identical" to 2016 postings by Worthington for the same position, which provide:

> SUMMARY: The Inside Sales Rep is responsible for the day-to-day sales functions such as order entry, order expediting, and problem resolution as well as having a constant awareness of impact on profits. This position is responsible for developing and building key relationships with customers. The ISR works closely with the Territory and Integrated Planning Desk Managers to ensure that the customer's needs are met and works to ensure that all customer quotes are done in an accurate and timely manner. The ideal candidate has the ability to build customer relationships and through communication, integrity and trust strives for 100% customer satisfaction.
>
> RESPONSIBILITIES:

• Performs order entry, order tracking, status review, and gathering market intelligence.
• Responsible for customer communication (phone, e-mail, fax).
• Manages releases to shipping. process short pays.
• Provides daily communication and status updates with Territory Manager.
• Enters material information and manages price accuracy.
• Serves as the initial contact on customer claims, and quotes.
• Coordinates with the integrated planning department for proper material flow and inventory levels.
• Provides account coverage for out of office team members.
• Other duties as assigned.

REQUIREMENTS:
• Building customer relationships and listening
• Proficient computer skills- Microsoft Office
• Good organizational skills
• High level of integrity and trust
• Excellent problem solving skills
• Basic systems skills
• Basic steel processing and product knowledge not needed, but preferred
• Advanced communication skills
• Excellent prioritizing skills
• Customer service focus

Education/Training Required:
• Bachelor's degree or equivalent work experience
• 12 week on-the-job training in the inside sales department
• Plant training

(Doc. 63-8).

In response to the job posting, the following Taylor employees applied: 1) Caucasian male Howell Brown (Brown); 2) Caucasian male Marshall Girby (Girby); 3) Caucasian male Joe Kuntz (Kuntz); and 4) Zinnerman. (Doc. 53-2 at 4 (Decltn. Yontz); Doc. 53-3 (Decltn. Seeds); Doc. 53-4 (Decltn. Ballinger)).  Seeds ranked Brown first, due to his many years of experience at Taylor, his technical knowledge, his experience in international sales, as he was the most well-rounded and because he was the former Customer Service manager.  (Doc. 53-3 at 5 (Decltn. Seeds)). Seeds ranked Kuntz second, as even though he had not been with Taylor long, he had an associate degree in drafting, engineering experience, had written operating manuals and seemed a good

technical fit.  (Id.)  As for Zinnerman, Seeds found no negatives but thought she lacked the desired

skill set due to her lack of technical education/experience and because she had less technical

customer support experience than Brown and/or Kuntz.  (Id.) Seeds stated that he did not consider

the applicants' educational backgrounds, personnel files, race or sex.  (Id. at 6 (Decltn. Seeds)).

      Seeds and Yontz met to discuss the applicants, at which time Seeds provided his

recommendations and opinions.  (Doc. 53-2).  While Seeds shared his opinions with Yontz, he

was not the decision maker.  (Doc. 53-3 at 4 (Decltn. Seeds)).

      Thereafter, on November 23, 2015, Yontz interviewed four (4) applicants (Doc. 53-2 at 4

(Decltn. Yontz); Doc. 53-1 (Dep. Zinnerman at 67).  See also Doc. 53-2 at 11 (11/24/15 email).

During the interview, Yontz discussed the Inside Sales Representative job posting with Zinnerman

and the requirements for *that* position.  (Doc. 63-2 at 7 (Aff. Zinnerman)).  Yontz never asked

Zinnerman about her technical knowledge concerning cryoscience products and/or cryoscience

technical support knowledge/skills, but instead, only discussed the inside sales representative

position and its responsibilities. (Id. at 11).

      Following the interviews, Yontz ranked Brown first due to his many years of experience

with Taylor (since 1981) and its product line, his depth of knowledge (especially technical which

was very valuable to Worthington) and based on Seeds' opinion that he was the top choice.  (Doc.

53-2 at 4-5 (Decltn. Yontz)).  Yontz ranked Kuntz second, as she thought very highly of his

suitability given his extensive product knowledge and technical background.  (Id.)  Yontz ranked

Zinnerman third because she did not demonstrate a great deal of technical knowledge about the

cryoscience product line and lacked the level of technical knowledge of Brown and/or Kuntz, an

important quality Worthington was seeking for its new hires.  (Id. at 5).  Yontz also noted that

Zinnerman's job had been a "true inside sales" position supporting existing customer accounts, a

function which could be served by the Ohio employees. (Id.) In deciding who to hire, Yontz "heavily considered" Seeds' opinions, and on November 24, 2015 provided her recommendations to Worthington. (Doc. 53-2 at 5-6 (Decltn. Yontz); Doc. 53-2 at 11, 14 (emails)).

In December of 2015, Worthington purchased Taylor's assets. (Doc. 53-2 (Decltn. Yontz at 1-2)). On December 4, 2015, Taylor ceased operations and all of its employees (including Zinnerman) were terminated. (Doc. 53-1 (Dep. Zinnerman at 41)). From December 2015 to March 30, 2016, Zinnerman stayed on as a temporary employee of a staffing agency and was never employed by Worthington. (Id. (Dep. Zinnerman at 9, 20, 61-67)). When she left, Seeds provided her with a letter of recommendation, but due to feeling mistreated by Seeds, Zinnerman would not use it to secure other employment. (Doc. 63-2 at 13 (Aff. Zinnerman)).

C.    **Brown, Kuntz & Seeds**[4]

1.    **Brown**

According to Zinnerman, Howell Brown (Brown) was hired by Taylor in 2003[5] to work in the customer service department. (Doc. 63-2 at 10 (Aff. Zinnerman)). Zinnerman trained Brown. (Id.) Brown had barely any sales volume, did not sell much at all (no sales margin, did not gross 10% of Zinnerman's sales volume) and conducted no cryoscience sales -- only industrial. (Id. at 8-9). Brown was not given a sales commission contract/agreement. (Doc. 63-2 at 10 (Aff. Zinnerman)). Shortly before Worthington acquired Taylor, Brown changed his title to inside sales, however he did not have any of the responsibilities Zinnerman had as an inside sales representative, did not have a contractual sales agreement, did not call on customers to generate new orders and

---

[4] Marshall Girby was another applicant (Caucasian male); however, he was not hired.

[5] Brown had not been employed at Taylor since 1981. Rather, Brown had been employed by a different company American Welding & Tank (propane business) which is owned by the Harsco Corporation, which also owned Taylor. (Doc. 63-2 at 10 (Aff. Zinnerman)).

did not receive any sales commissions on cryoscience sales.  (Id. at 11).

### 2.    Kuntz

According to Zinnerman, Joe Kuntz (Kuntz) was hired by Taylor in 1990 or 1992.  (Doc. 62 at 7; Doc. 63-2 at 9 (Aff. Zinnerman)).  In 1994, he was an assistant to the marketing manager and did not perform any customer relations, service functions or sales of any products.  (Id.)  Kuntz did not create or draft manuals but only typed them up (they were prepared by the engineering department and by the marketing manager).  (Id. at 9-10).  In 1996, Kuntz was laid off from Taylor.  (Id.)  After working at Waffle House for approximately nine (9) years, in August 2014, Taylor re-hired Kuntz to assist the customer service department.  (Id.)  Zinnerman initially trained Kuntz -- to enter orders, process credit card payments, handle customer calls, etc. -- and continued training him (due to complaints about his work from customers, and his continuing to ask her how to do various tasks) after December 2015. (Id.)  Kuntz did not sell any cryoscience products and did not have a sales commission contract/agreement as did Zinnerman.  (Id. at 10).

### 3.    Seeds

Taylor's Customer Service Manager Matthew Seeds (Seeds) was employed by Taylor from 1993-1999, and then again from July 2010 until 2015.  (Doc. 53-3 at 3 (Aff. Seeds)). In 2010, Zinnerman provided a letter of reference for Seeds' employment application.  (Doc. 63-2 at 13 (Aff. Zinnerman)).  After being hired, Zinnerman trained Seeds.  (Id.)

Concerning their subsequent interactions, Zinnerman reported Seeds to both HR and her boss, for "violently kicking my chair while I was sitting in it."  (Doc. 63-2 at 12-13 (Aff. Zinnerman)).  In 2014, Zinnerman began reporting to Seeds in his department.  (Doc. 53-3 Decltn. Seeds); Doc. 63-2 at 6 (Aff. Zinnerman)).  Per Zinnerman, she believed that Seeds "was upset that she, a black female, was being brought over by the COO…to help the [customer service]

department get better.  She was to get an office, but…Seeds stated, 'You are not getting an office, you are going back to the bull-pen' in a very degrading tone, to a cubicle."  (Doc. 62 at 4).  In August 2014, Zinnerman "had to call him [Seeds] out for kicking me on my leg, had to let him know that I did not appreciate him putting his foot on me. It was very disturbing and disrespectful." (Id. at 13).  Also in 2014, Seeds denied Zinnerman vacation time "in violation of company policy, and in violation of experience status in favor of white males[,]" and in communicating the denial to her via e-mail, stated "Shelia-you're the odd man (woman) out!"  (Id.; Doc. 63-13).  Seeds explained that two (2) co-workers (Girby and Brown) had requested the same days off before she did and "they are both senior to you in length of service."  (Doc. 63-13).  Additionally, several times when Zinnerman ran into Seeds in the hallway, he would say "young lady, are you sure you don't want to come back to the customer service to work for me?" -- which made her feel disrespected as the customer service job "was not degrading, but the question was degrading because the job of Inside Sales Representative and Inside Sales Manager in 2010 was a promotion for her that she was very proud of."  (Doc. 63-2 at 4 (Aff. Zinnerman)).  Moreover, Seeds often asked Zinnerman to "fill in" and do others work (including his own) when out of the office.  (Doc. 62 at 6-7).  In sum, Zinnerman felt disrespected by Seeds over the years.  (Id. at 13).

Related to his job duties, Seeds did not sell any cryoscience products and did not have a sales commission contract/agreement.  (Doc. 63-2 at 10 (Aff. Zinnerman)).  And shortly before Worthington acquired Taylor, Seeds changed his title to inside sales, however, he did not have any of the responsibilities that Zinnerman had as an inside sales representative, did not have a contractual sales agreement, did not call on customers to generate new orders and did not receive any sales commissions on cryoscience sales.  (Id. at 11).

Zinnerman suggests she competed with Seeds for the position at Worthington.  Per Yontz,

the decision maker who conducted the interviews, Seeds was not competing against Zinnerman

(or others) because he had *already* been hired.  (Doc. 53-2 (Decltn. Yontz).  And per Seeds,

Worthington "informed [him] that I would be one of those employees[]" hired in Alabama, *before*

individuals were interviewed for the "two available positions."  (Doc. 53-3 (Delctn. Seeds at 4)).

## D.    **EEOC Charge & Worthington Response**

On April 14, 2016, Zinnerman filed an EEOC Charge of Discrimination against Taylor for

discrimination.  (Doc. 15-1 (received 4/15/16)).  Zinnerman charged as follows:

> I am an African American female, I began working for Taylor-Wharton in May 1994. I
> started in accounting, moved to customer service, became a customer service supervisor,
> moved into inside sales and finally ended up in dual role of inside sales and customer
> service as of April 2014.  My job performance was excellent as demonstrated by my sales.
> I was the only African American in accounting, sales and customer service throughout my
> career. I was the only female in sales. Taylor-Wharton went into bankruptcy in October
> 2015, and Worthington Ind. purchased the Cryo-Science division of the company where I
> worked in December 2015….Among the sales I handled, one area was Cryo-Science sales.
> I was selected among other "key" employees to stay on at Taylor-Wharton to wind down
> the business. We worked for Express Employment Professionals (EEP) to provide
> temporary workers in the wind-down of Taylor Wharton's business. Every key employee
> retained in the office except me was offered a retainer fee, of at least 2 months of salary.
> They are all white except me.  I was laid off on 3/30/16 because I was told my work was
> done. Instead of laying me off, I should have gone to work for Worthington. I was the only
> employee in Cryo-Science sales not offered a job at Worthington.  All the sales employees
> retained by Worthington were white males.  My inside sales representative job was taken
> over by Howell Brown, a white male and former Taylor-Wharton employee who worked
> in customer service. He was not a Cryo-Science sales person. As stated above, Worthington
> only purchased Taylor Wharton's Cryo-Science division. I was substantially more qualified
> than Brown for the job he got at Worthington. I have been discriminated against because
> of … my race and my gender.

In response, Worthington's EEOC Statement provides that it does "does not acknowledge

discrimination" against Zinnerman based on race and/or sex concerning the positions available

when it acquired Taylor (inside sales manager, inside sales and inside sales/technical quality

support) for which Brown, Girby, Kuntz, Seeds and Zinnerman were interviewed.  (Doc. 63-9).

Worthington explained:

Worthington did do a skills and assessment. Julia Yontz, Inside Sales Manager for Worthington Industries Interviews all five candidates and they were ranked as followed:

> 1.) Matthew Seeds- Was current Taylor Wharton Inside Sales Manager, has management experience and product knowledge. Strategic vision of sales products in North America. Will replace a manager for Worthington Industries.
> 2.) Marvin H. Brown- Versatile, knowledgeable employee with depth of all products, long industry business knowledge.
> 3.) Joseph Kuntz- Technical aptitude, good product sales knowledge, able to fit the future vision for North American product line.
> 4.) Shelia Zinnerman-Direct Inside Sales experience, didn't see depth.
> 5.) Marshall Girby-International Insides Sales- we only purchased North American business and did not have a need for international knowledge at this time.

We hired the following candidates:

Matt Seeds -Inside Sales Manager / Project Manager
Matt Seeds is white male… with 6 years of experience with Taylor Wharton.

Marvin Howell Brown -Inside Sales
Howell Brown is a white male….with 35 years of experience with Taylor Wharton.

Joe Kuntz -Inside Sales / Technical Quality Support
Joe Kuntz is a white male….with 2 years of experience.

…As to Ms. Zinnerman's claim as to gender and race discrimination, the fact that the company ranked Mr. Girby, a white male[] [sic], lower than Ms. Zinnerman defeats those claims.

Worthington…did not discriminate against Shelia Zinnerman based on race[] [or] sex…but simply hired the best candidates for the open positions….

(Doc. 63-9).

## II.    Conclusions of Law

### A.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Rule 56(c)(1)-(4) provides as follows:

**(c) Procedures.**

(1) **Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) **Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) **Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.

(4) **Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

The movant bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the non-movant fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter….Instead, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998–999 (11th Cir. 1992).

**B.    Discussion**

Zinnerman's claims are rooted in the belief that she was discriminated against by Worthington based on sex and/or race in violation of Title VII because she was not hired for a position for which Caucasian males were hired, even though she had more experience and was more qualified.  In her own words: "I was the best at it [my job]. There was no viable reason for me not to be hired. The only reason was I was a black female."  (Doc. 63-2 at 12 (Aff. Zinnerman)). In support, Zinnerman relies on her Affidavit (and exhibits thereto), from which she argues that Worthington is lying --- about the other applicants' years of employment, work history, experience, whether Yontz knew the applicants race/gender, about her job duties and experience, etc.

Title VII makes it "an unlawful practice for an employer to [] fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" race or sex. 42 U.S.C. § 2000e–2(a)(1).  Zinnerman may establish her claims with direct evidence, circumstantial evidence, or statistical proof.  Rioux v. City of Atlanta, Ga. 520 F.3d 1269, 1274 (11th Cir. 2008).[6]  There is no allegation or submission of direct evidence or statistical proof.  Thus, Zinnerman's claims are based on circumstantial evidence.

When there is only circumstantial evidence, courts apply the framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See, e.g., Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000). Under McDonnell Douglas, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination based on failure to hire.  Id.  Thereafter, as explained in Mosley, 562 Fed. Appx. at 867-868 (footnote omitted):

…the employer must then articulate a legitimate, nondiscriminatory reason for its actions,

---

[6] Direct evidence is "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee."  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004). See, e.g., Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-1228 (11th Cir. 2002); Taylor v. Runyon, 175 F.3d 861, 867 (11th Cir. 1999); Jones v. Bessemer Carraway Med. Ctr., 151 F.3d 1321, 1323 n. 11 (11th Cir. 1998); Burrell v. Board of Trustees of Ga. Military College, 125 F.3d 1390, 1393 (11th Cir. 1997).

and then the plaintiff must offer evidence that the alleged reasons of the employer are pretext for illegal discrimination. *McDonnell Douglas*, 411 U.S. at 802–04….

Regarding the defendant's burden to articulate a legitimate, nondiscriminatory reason for their employment decisions, the proffered reason must "rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred." *Tex. Dep't of Cmty. Affairs, v. Burdine*, 450 U.S. 248, 254…(1981). Defendants need not persuade the court they were actually motivated by the proffered reasons, but must raise a genuine issue of fact as to whether they discriminated against the plaintiff. *Id*….

If the employer satisfies this burden, the burden then shifts back to the plaintiff to establish pretext. To do so, a plaintiff "cannot merely quarrel with the wisdom of the employer's reason, but 'must meet the reason head on and rebut it.'" Moore v. Jefferson Cty. Bd. Of Educ., 2012 WL 3030109, *7 (N.D. Ala. Jun. 11, 2012)). Courts are not concerned with whether an employment decision is prudent or fair, only with whether it was motivated by unlawful animus; for instance, an employer may fire an employee for a reason based on erroneous facts or for no reason at all, so long as the action is not for a discriminatory reason. Pitts v. Housing Auth. v. City of Huntsville, AL, 262 Fed. Appx 953 (11th Cir. 2008). A reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis added). See also Matthews v. City of Mobile, Al., 2016 WL 1736061, *11 (S.D. Ala. May 2, 2016).

However, in Sims v. MVM, Inc., 704 F.3d 1327, 1332–1333 (11th Cir. 2013), the Eleventh Circuit clarified that the McDonnell Douglas framework is not the *sine qua non* for a plaintiff to survive summary judgment. Smith, 644 F.3d at 1328. Instead, "[t]he plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Id. As such, a triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence to allow a jury to infer intentional discrimination by the decisionmaker. Id. Hamilton v.

Southland Christian School, Inc., 680 F.3d 1316, 1320 (11th Cir. 2012).

**1.**    ***Prima Facie* Case**

Zinnerman must establish a *prima facie* case of failure to hire discrimination based on race and/or sex. Lane v. Broward Cty., Fla., 411 Fed. Appx. 272, 273 (11th Cir. 2011).  "In a typical failure-to-hire scenario, the plaintiff establishes a prima facie case of unlawful discrimination by demonstrating that: "(1) she was a member of a protected class; (2) she applied and was qualified for a position for which the employer was accepting applications; (3) despite her qualifications, she was not hired; and (4) the position remained open or was filled by another person outside of her protected class." *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir.2002)." Trask v. Secretary, Dept. of Veterans Affairs, 822 F.3d 1179, 1191 (11th Cir. 2016). Zinnerman is a member of protected classes (African American and/or female), she applied for the position and the position was given to someone outside of her protected classes (a non-African American and/or male).  Worthington does not dispute -- for summary judgment -- that Zinnerman was qualified for the position and was rejected despite her qualifications.  (Doc. 54 at 18).  Thus, on summary judgment Zinnerman has established a *prima facie* case for race and/or sex discrimination.

**2.**    **Legitimate Non-Discriminatory Reasons**

Worthington articulates two (2) legitimate non-discriminatory reasons for not hiring Zinnerman: 1) the company was looking for candidates with good technical knowledge of the cryoscience product line and Yontz concluded that Zinnerman demonstrated less ability and experience in that area than others; and 2) per Yontz, Zinnerman's "inside sales" job functions were already being handled by existing employees in Ohio.  (Doc. 54 at 24).

Concerning qualifications, per Worthington, Zinnerman had less of the knowledge and experience in the cryoscience product line (that Worthington needed) than Brown and Kuntz.

Specifically, Yontz ranked Brown first, as the top candidate, because of his many years of experience with Taylor and its cryoscience product line (since 1981). (Doc. 53-2 (Decltn. Yontz at ¶5)). Yontz believed Brown's experience and technical knowledge would be very valuable to Worthington after its acquisition of the cryoscience business. (Id.) Yontz also relied on the fact that Brown was Seeds' top choice to continue to handle inside sales in Alabama due to his experience, technical knowledge and familiarity with Worthington in a previous position. (Id.) Concerning Kuntz, Yontz ranked him second, as she thought very highly of his suitability for the position due to his extensive product knowledge and technical background. (Id.) As to Zinnerman, Yontz ranked her third, as she did not demonstrate a great deal of technical knowledge about the cryoscience product line (and less than Brown and Kuntz), which was an important quality Worthington was seeking. (Id.)

As for Zinnerman's "Inside Sales" job (and functions/duties), Yontz concluded that her job with Taylor had been a true "inside sales" position supporting existing accounts, a function which would be served by existing Worthington employees in Ohio. (Doc. 53-2 (Decltn. Yontz)). Per Seeds, Zinnerman's inside sales position's "main job duties were to cold-call former customers and seek new orders[;]" she "did not have any post-order customer service or support functions, which Worthington considered to be technical support[.]" (Doc. 53-3 (Decltn. Seeds).

In response, Zinnerman argues that Worthington has failed to carry its burden because she was not *really* under consideration (i.e., Yontz did not actively compare her with the others as part of the application process). The record establishes that Zinnerman was considered during the application process and that Yontz provided reasons for hiring others, and thus, this contention is unpersuasive. In sum, the Court is satisfied that Worthington has articulated legitimate non-discriminatory reasons for not hiring Zinnerman, and reasons that are "clear and reasonably

specific." <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 258 (1981). These reasons, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action," <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511 (1993), such that the issue now turns on whether Zinnerman establishes a genuine issue of material fact that the reasons are pretext.

**3.    <u>Pretext</u>**

In an effort to establish pretext, Zinnerman essentially claims that Worthington is lying and that its proffered reasons are directly contradicted by the evidence she has submitted (her Affidavit based on her personal knowledge and exhibits thereto). First, Zinnerman points to alleged contradictions between the company's EEOC Statement and assertions on summary judgment. Per Zinnerman, Worthington contends there were four (4) candidates for two (2) positions[7] available in Alabama, it ranked Zinnerman last, and that the hiring decision was based on each applicant's 20 minute interview with Yontz (and her reliance on Seeds' recommendations). In its EEOC Statement, Worthington asserts there were five (5) candidates for three (3) positions, it ranked Girby last (below Zinnerman), and that it "did do a skills and assessment" as well as the interviews. (Doc. 63-9 at 2). Zinnerman contends this is contradictory, and that an employer's inconsistent EEOC statement may be considered when assessing the employer's proffered reasons. <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1038 (11th Cir. 2000). Shifting reasons that would allow a jury to question an employer's credibility can help demonstrate the pretextual nature of an employee's explanation for terminating an employee. <u>See</u>, <u>e.g.</u>, <u>Cleveland v. Home Shopping Network</u>, 369 F.3d 1189, 1194 (11th Cir.2004); <u>Bechtel Constr. Co. v. Sec. of Labor</u>, 50 F.3d 926, 935 (11 Cir.1995). However, such shifting reasons are not -- standing alone -- proof of pretext. Moreover,

---

[7] As Worthington had already decided Seeds should be hired as Technical Support Manager at the Alabama location. (Doc. 53-2 at 3 (Aff. Yontz)).

based on the record before the Court, the undersigned cannot agree that the reasons are "shifting" and thus finds this argument by Zinnerman unpersuasive.

Second, concerning qualifications (ability/experience), Zinnerman contends she should have been ranked as the top candidate and hired instead of Brown and Kuntz. Specifically, Zinnerman was employed when Brown was hired, and he was hired in 2003 (nine (9) years after she was), not in 1981. Per Zinnerman, Brown also conducted no cryoscience sales, only industrial, and did not sell much at all. With regard to Kuntz, Zinnerman claims that she had more total experience in sales and customer service in the cryoscience product line, trained him, had a long history of high sales in cryoscience products when he did not, was certified/trained in those products while he was not, and had been working at Taylor since 1994 but had only been recently hired (in 2014, and his prior job was Waffle House store manager for 9 years).[8] Zinnerman adds that Kuntz did not draft or create manuals for Taylor (as Seeds represented), but just typed them up (i.e., they has already been drafted by the engineering department/marketing manager).

Additionally, Zinnerman summarily disputes Yontz's representation that she did not review any of the applicant's work history, performance, personnel files, documentation etc., pointing to her conclusions -- e.g., that Zinnerman was not as qualified in the cryoscience product line (i.e., that she *had* to have reviewed *something*). Zinnerman "believe[s]" that Yontz had "full access" to personnel files. (Doc. 53-1 (Dep. Zinnerman at 88)). "My belief is that Worthington knew all my credentials…Yontz knew all of my positions and my qualifications…she made the decision to hire these white men with less experience…All of these white males I trained, I was there…before them…. I've trained all of them….I wasn't hired because they had a preference, I was the most

---

[8] As alleged by Zinnerman, Taylor hired Kuntz in 1992 as assistant to the marketing manager (did not perform product sales, customer relations, service functions), he was laid off in 1996, and he returned in 2014.

qualified." (Doc. 53-1 (Dep. Zinnerman at 94)). Per Zinnerman, she was discriminated against because: "I was well qualified, I was more qualified, I was the only female and I was the only black. And she [Yontz] told me that I had good credentials so the only thing less that I didn't have was that they were male and I'm a female and I'm black and they're white….." (Id. (Dep. Zinnerman at 95-96)). "[T]hey didn't hire any blacks…the whole office was all Caucasians." (Id. (Dep. Zinnerman at 105)). Zinnerman testified Worthington "had a preference for who they wanted[,]" as they did not hire her when she had better credentials, cryoscience sales experience (and record) and trained Kuntz (who was hired) and others. (Doc. 53-1 (Dep. Zinnerman at 95)).

Then, in a somewhat contrary argument, Zinnerman asserts that if Yontz had reviewed the applicants' information, she would have seen her extensive performance history in the cryoscience product line (sales). Per Zinnerman, she did what "everybody else" was doing (including Seeds, Brown and Kuntz) *and more*:

> providing technical support, entering orders, handling domestic and international customer, setting up customer's accounts in JDE, updating orders in the system, sending out order acknowledgements, obtaining freight quotes, issuing MRA's (Material Return Authorizations), Answering C.S. phones, issuing credits, following ups on orders, calling customers, and filling in for Matt, Marshall, Howell and Joe when they went on vacation. She was responsible for all Customer Service duties, while working under the supervision of Matthew Seeds… [and] handled all aspects of both industrial and cryoscience sales, and handled all aspects of customer service and technical support …

(Doc. 62 at 5 (citing Aff. Zinnerman at ¶¶ 16-17); Doc. 63-2 (Aff. Zinnerman); Doc. 62 at 12-13). Zinnerman adds that neither Brown nor Kuntz ever sold cryoscience products whereas she knew the cryoscience business inside and out. (Doc. 63-2 (Aff. Zinnerman and Ex. H thereto)). Zinnerman argues further, that during her interview, Yontz never even asked her about her technical knowledge and/or skills related to cryoscience products so, in essence, how could Yontz conclude she did not demonstrate a great deal of technical knowledge about the cryoscience product line (and/or exhibited less than Brown and Kuntz). (Id.)

18

Moreover, Zinnerman contends that Yontz knew all of the applicants' race and gender, so her statement in her Affidavit that she did not, is untrue. Specifically, in the Summer of 2015, months before the interviews, Seeds introduced Yontz to all of the employees in the customer service department in Alabama (all of the applicants) such that she had at least observed the race and sex of everyone in the office at that time. Yontz later interviewed the applicants face-to-face (except for Brown).

Third, Zinnerman disputes Seeds' characterization of her job (and duties) -- upon which Yontz "heavily relied", and argues that instead, for her job (regardless of title):

> she was given specific accounts of existing customers to handle and to generate new customers and obtain orders. She constantly added new customers and received new orders daily. And she assisted all her accounts with whatever they needed including technical support, and issuing MRA (Material Return Authorizations) as needed. Her main objective was to increase Cryo-Science; although, she sold Liquid Cylinders and Beverage Carbonation Units. In addition, she sent our "sales blasts" to various markets that used Cryo-Science Units, including hospitals, colleges, universities, schools, the artificial insemination markets/animal breeders, restaurants, fertility clinics, doctor offices, etc. In 2010, 2011, 2012, 2013, 2014, and 2015, she managed to sale an average of $2 million dollars of Cryo-Science products, each year (See Aff. Exhibits A - E) that would have been impossible with just cold calls. Her overall sales margin was between 37-42 percent. (Aff. Exhibits A-E). Had she just "cold-called former customers and only seek new orders" as falsely asserted, there would have been no way that she could have produced such sales volume or sales margins, and no way could she have added the large number of new customers and accounts to TW's customer base. In short, she was a primary reason the cryoscience business of TW was so successful, and that Worthington was willing to purchase it. In 2013 her total wages from TW totaled $68,000; in 2014 they totaled $79,000; and in 2015 $80,000. My base salary was $52,000 per year, the rest was my sales commission.
>
> ***
>
> Zinnerman issued MRA's and provided Tech Support. Beginning in April 2014, she was a Customer Service Employee working as a Customer Service Representative, in addition to working as an Inside Sales Representative. She was responsible for doing both jobs. She was doing everything in the customer service department that Matt Seeds, Howell Brown, Marshall and Joe Kuntz were doing, including providing technical support, entering orders, handling domestic and international customer, setting up customer's accounts in JDE, updating orders in the system, sending out order acknowledgements, obtaining freight quotes, issuing MRA's (Material Return Authorizations), answering customer's phone calls, issuing credits, and filling in for Matt, Marshall, and Howell when they went on

> vacation; and training Joe. She was responsible for all Customer Service duties she took care of all the accounts that she generated, including any technical issues.

(Doc. 62 at 12-13 (citing Aff. Zinnerman at par. 12 and Ex. I thereto)). From this and the previously chronicled complaints of disrespect by Seeds, Zinnerman appears to suggest a "cat's paw" theory with respect to Seeds -- i.e., that Seeds had racially or sexually discriminatory animus towards her. However, while Yontz may have relied on Seeds' opinion, she testified that she made her own independent decision when making the final hiring decision. Zinnerman has not submitted evidence suggesting -- or establishing -- otherwise. Regardless, on summary judgment, the Court has taken Zinnerman's own description of her job title, position and duties in the light most favorable to her.

Zinnerman believes that because she was the most qualified applicant, the only reason Worthington possibly could have had for not hiring her is: "I'm a female and I'm black and they're white." From this, Zinnerman urges the Court to find prextext. However, this is a unilateral -- and unsupported by any evidence-- conclusion on her part, and Zinnerman cannot establish pretext by simply arguing that she was better qualified. See, e.g., Springer v. Convergys Customer Mgt. Grp. Inc., 509 F.3d 1344, 1349 (11th Cir. 2007); Brooks v. County Comm'n of Jefferson Cty., Al., 446 F.3d 1160, 1163 (11th Cir. 2006); Hillerman v. University of Central Fla., 167 Fed. Appx. 747, 749 (11th Cir. 2006). The relevant question is whether Worthington failed to hire Zinnerman *based on an unlawful motive* (Denny v. City of Albany, 247 F.3d 1172, 1188 (11th Cir. 2001)) -- not based on her being more (or the most) qualified, incorrect information, a lack of information, a failure to fully review credentials/work history, misplaced reliance on a recommendation (Seeds), incorrect job duty descriptions, etc. Federal Court is not an appeal board for business decisions unless there is some evidence of improper motive that violates federal law.

In sum, for pretext Zinnerman has to show that: 1) Worthington's proffered reasons are

false; *and* 2) discrimination was the real reason she was not hired. Springer, 509 F.3d at 1349; St. Mary's, 509 U.S. at 516. Even assuming the proffered reasons by Worthington are false, i.e. that Zinnerman had the technical experience that Worthington needed and was thus the most qualified, Zinnerman has failed to show that discrimination was the real reason she was not hired. Thus, Zinnerman has failed to establish pretext. See, e.g., Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996) ("[r]ebuttal requires that a plaintiff present 'significant probative evidence on the issue to avoid summary judgment….conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext[]'"); Young v. General Food Corp., 840 F.2d 825, 830 (11th Cir. 1988) (same); Hollingsworth v. O'Reilly Automotive Stores, Inc., 2015 WL 412894, *10 (N.D. Ala. Jan. 30, 2015) (granting summary judgment in favor of defendant as plaintiff "offers only isolated facts tied together with speculation. The leaps that a fact finder would have to make to find pretext in the present case are too great, and…[plaintiff's] narrative does not rise above conjecture[]").

### 4.   **Convincing Mosaic**

Even discarding McDonnell Douglas, the Court is unable to piece together a "convincing mosaic" from the circumstantial evidence from which a reasonable jury could infer an unlawful discriminatory intent in the failure to hire Zinnerman based on race and/or sex. Cf. Davis v. Dunn Constr. Co., Inc., 2012 WL 1952125, *15 (N.D. Ala. May 24, 2012) ("In [Smith], [644 F.3d 1321] the 'convincing mosaic of circumstantial evidence' was extensive: there was a documented history of disparate treatment of Caucasian and African–American employees, a spreadsheet listing the employees by name and race that the defendant's disciplinary review committee used to make discipline decisions, and a news program reporting the defendant's struggles with racism in the workplace[ ]"). The record lacks examples of overt race or sex hostility or historical evidence of

such disparity, and Zinnerman does not detail any race or sex "events" surrounding (or involved in) the interview and/or application process with Worthington. The evidence also indicates that the decision not to hire Zinnerman was based on factors (albeit possibly incorrect/inaccurate) unrelated to her protected status (sex and/or race).

Moreover, while Zinnerman references some *past* interactions with Seeds in which she felt disrespected (having her chair kicked, being called a "young lady" and the "odd man (woman!) out," being asked to return to his department (rather than remain where she was promoted), failing to get an office, being denied vacation leave once, etc.), there is no evidence that these interactions were motivated by race and/or sex discrimination. Disrespect or dislike -- without more -- is not actionable discrimination. See, e.g., Chavez v. URS Fed. Tech. Servs., Inc., 504 Fed. Appx. 819, 822 (11th Cir. 2013) (being treated less kindly than colleagues, evidence of individualized dislike (personal animosity), favoritism towards others, or even a vendetta, is not the equivalent of discrimination); Succar v. Dade Cty. School Bd., 229 F.3d 1343, 1345 (11th Cir. 2000) ("Title VII….is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of sex [and/or race] discrimination....The plaintiff cannot turn a personal feud into a…discrimination case....") (quoting McCollum v. Bolger, 794 F.2d 602, 610 (11th Cir. 1989); Hawkins v. Ceco Corp., 883 F.2d 977, 986 (11th Cir. 1989) ("Hawkins presented evidence that Rascoe did not like him, but a dislike alone is not evidence of racial discrimination[]"). Such is Zinnerman's own conjecture and subjective conclusion. See, e.g., Turner v. Monroe Cty. Bd. Ed., 2015 WL 475842, *7 (S.D. Ala. Aug. 12, 2015) (while Murphy may have been unkind to Turner and perhaps disliked her, and even assuming….the transfer that was somehow rooted in this dislike, there is no evidence of any racial component or discrimination[]").

Zinnerman "bears the ultimate burden of proving that the employment action at issue

[failure to hire her] was taken because of the plaintiff's [protected characteristic -- race and/or sex][,]" <u>EEOC v. Joe's Stone Crab, Inc</u>., 220 F.3d 1263, 1273-1274 (11th Cir. 2000). Whether an employment decision was "prudent or fair" is irrelevant, <u>Damon v. Fleming Supermarkets of Fla., Inc</u>., 196 F.3d 1354, 1361 (11th Cir. 1999), as "[t]he ultimate burden of persuading the trier of fact that the defendant is intentionally discriminating against the plaintiff remains at all times with the plaintiff[,]" <u>Wilson</u>, 376 F.3d at 1086. Zinnerman has failed to present sufficient evidence from which a trier of fact could reasonably find in her favor, and thus has failed to satisfy her burden. As such, Worthington's motion for summary judgment on Zinnerman's Title VII race and/or sex discrimination claim (Count I) is **GRANTED.**

**IV.   <u>Conclusion</u>**

Accordingly, it is **ORDERED** that Worthington's motion for summary judgment (Docs. 51-53) is **GRANTED in part** and **MOOT in part**: **GRANTED** as to Zinnerman's Title VII sex and race discrimination claims (Count I); and **MOOT** as to Zinnerman's ADEA claim (Count II).

A Final Judgment consistent with the terms of this Order shall be entered by separate document as required by Rule 58 of the <u>Federal Rules of Civil Procedure</u>.

**DONE** and **ORDERED** this the **7th** day of **May 2018.**

/s/ Kristi K. DuBose
**KRISTI K. DUBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**